IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

UNITED STATES OF AMERICA

vs.                                      Case Nos.:   5:09cr41/RS/GRJ
                                                      5:11cv180/RS/GRJ

MICHAEL J. WEBB

---

## REPORT AND RECOMMENDATION

This matter is before the court upon Defendant's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 and supporting memorandum of law. (Docs. 83, 88).  The Government filed a response (Doc. 93) and Defendant filed a reply. (Doc. 102.)  The undersigned held an evidentiary hearing on March 15, 2014.  After a careful review of the record and the arguments presented, including the evidence presented at the evidentiary hearing, the Court concludes that Defendant's motion should be denied.

## PROCEDURAL BACKGROUND[1]

Defendant was charged in a two count indictment with (1) conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base in violation of 21 U.S.C. §§ 841(b)(1)(A)(ii) and (iii) ("Count One"), and (2) possession with intent to distribute more than fifty grams of cocaine base on a date certain in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii),

---

[1]Detailed statements of facts describing the offense conduct are set forth in the Statement of Facts (Doc. 30) and the Presentence Investigation Report (Doc. 58) and will be set forth herein only as relevant to the instant motion.

and 841 (b)(1)(C) ("Count Two"). (Doc. 13.)  Co-defendant Stacey Stembridge was charged only in Count One.

The Government filed enhancement information announcing its intent to seek enhanced penalties due to Defendant's three prior felony drug convictions. (Doc. 22.)

Defendant entered a plea of guilty pursuant to a written plea agreement and statement of facts on February 3, 2010. (Docs. 28–31.)  He also filed a motion for release from custody pending disposition of the case, which was denied. (Docs. 26, 27, 32.)  At the change of plea hearing, the court specifically informed Defendant that if the enhancements filed by the Government were proper, he faced, as to each count, a mandatory term of life imprisonment, and if not, he faced a mandatory minimum term of ten years imprisonment. (Doc. 107 at 9–10.)  Defendant advised the Court that he understood. (*id*. at 10.)

The Presentence Investigation Report ("PSR") was disclosed to the defense on March 17, 2010. (*see* Docs. 42, 58.)  Because Defendant had at least two prior felony controlled substance offenses, he was classified as a career offender with an offense level of 37 (PSR ¶ 24).[2]  After a three level adjustment for acceptance of responsibility,

---

[2] Otherwise calculated, based on his involvement with both powder and crack cocaine, Defendant was held accountable for 12,023.38 kilograms of marijuana (PSR ¶ 15).  This figure reflected not only the 56.9 grams of cocaine and 450.6 grams of cocaine base recovered from Defendant, but also an additional 15 kilograms of cocaine derived from Defendant's 30 trips to Atlanta to purchase cocaine (PSR ¶ 9).  Stembridge was not Defendant's only supplier as he was held accountable for less than three kilograms of cocaine powder (doc. 62 at ¶¶ 9, 15).

his total offense level was 34 (PSR ¶¶ 26, 27).[3]  Defendant's criminal history category

was VI (PSR ¶ 49).[4]  The applicable guidelines range of 262 to 327 months was

trumped by the required statutory mandatory minimum sentences of life imprisonment

(PSR ¶¶ 81–83).

The defense had no objections to the PSR. (Doc. 92 at 3.)  At sentencing, the

court heard from several family members who asked for leniency in Defendant's behalf.

(Doc. 92 at 4–12.)  Counsel addressed the court, noting Defendant's cooperation and

asked that Defendant not be punished for his cooperation. (*id*. at 13.)  Counsel stated

that Defendant had been caught with approximately 20 ounces of controlled

substances, and argued that this would have been the appropriate weight for

sentencing but for Defendant's cooperation with law enforcement. (*id*.).  Counsel

advised the Court that Defendant immediately began cooperating upon his arrest, and

as a result of this cooperation the Government learned about co-defendant Stacey

Stembridge, but ironically the disclosure of this information had increased Defendant's

relevant conduct to 15 kilograms. (*id*. at 14.)  The Court observed that Defendant had

been a drug dealer starting at the age of 14, and but for his cooperation, his sentence

would have been a mandatory life sentence. (*id*. at 15–16.)  After hearing from the

Defendant, the court sentenced him to a term of 295 months imprisonment on each

---

[3] If Defendant had not been a career offender, his total offense level would have
been 31 after being held accountable for the marijuana equivalency of 12,023.38 kilograms
of marijuana, a two level reduction due to the cocaine base adjustment pursuant, and an
additional three level reduction for acceptance of responsibility (PSR ¶¶ 15, 16, 22, 23).

[4] If Defendant had not been a career offender his criminal history category would
have been IV (PSR ¶ 49).

count, to run concurrently. (*id*. at 20–21.)  The court stated that the term was "below the minimum of the sentencing range as computed in the presentence report," and that the sentence was sufficient but not greater than necessary to comply with the statutorily defined purpose of sentencing. (*id*. at 21.)  The Court advised Defendant of his appellate rights and the proceedings concluded.  Judgement was entered on June 7, 2010 (Doc. 56) and Defendant did not appeal.

The present motion was timely filed pursuant to the prison mailbox rule on May 15, 2011. (Doc. 83 at 12.)  Defendant raises six grounds for relief, five of which are claims of ineffective assistance of counsel, and one of which challenges his sentence as substantively unreasonable.[5]  The Government opposes the motion in its entirety.

## LEGAL ANALYSIS

### *General legal standards*

Collateral review is not a substitute for direct appeal, and therefore the grounds for collateral attack on final judgments pursuant to § 2255 are extremely limited.  A prisoner is entitled to relief under section 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack.  *See* 28 U.S.C. § 2255(a); McKay v. United States, 657 F.3d 1190, 1194 n. 8 (11th Cir. 2011).  "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of

---

[5] Only the first three grounds for relief are addressed in Defendant's memorandum.

justice.'"  Lynn v. United States, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted).  The "fundamental miscarriage of justice" exception recognized in Murray v. Carrier, 477 U.S. 478, 496 (1986), provides that it must be shown that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent . . . ."

A motion to vacate under section 2255 is not a substitute for direct appeal, and issues which could have been raised on direct appeal are generally not actionable in a section 2255 motion and will be considered procedurally barred.  Lynn, 365 F.3d at 1234–35; Bousley v. United States, 523 U.S. 614, 621 (1998); McKay v. United States, 657 F.3d 1190, 1195 (11th Cir. 2011).  An issue is "'available' on direct appeal when its merits can be reviewed without further factual development."  Lynn, 365 F.3d at 1232 n. 14 (quoting Mills, 36 F.3d at 1055).   Absent a showing that the ground of error was unavailable on direct appeal, a court may not consider the ground in a section 2255 motion unless the defendant establishes (1) cause for not raising the ground on direct appeal, and (2) actual prejudice resulting from the alleged error, that is, alternatively, that he is "actually innocent."  Lynn, 365 F.3d at 1234; Bousley, 523 U.S. at 622 (citations omitted).  To show cause for procedural default, a defendant must show that "some objective factor external to the defense prevented [him] or his counsel from raising his claims on direct appeal and that this factor cannot be fairly attributable to [defendant's] own conduct."  Lynn, 365 F.3d at 1235.  A meritorious claim of ineffective assistance of counsel can constitute cause.  See Nyhuis, 211 F.3d at 1344.

Ineffective assistance of counsel claims are generally not cognizable on direct appeal and are properly raised by a § 2255 motion regardless of whether they could have been brought on direct appeal.  Massaro v. United States, 538 U.S. 500, 503 (2003); *see also* United States v. Franklin, 694 F.3d, 1, 8 (11th Cir. 2012).  In order to prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate both that counsel's performance was below an objective and reasonable professional norm and that he was prejudiced by this inadequacy.  Strickland v. Washington, 466 U.S. 668, 686 (1984); Williams v. Taylor, 529 U.S. 362, 390 (2000); Darden v. United States, 708 F.3d 1225, 1228 (11th Cir. 2013).  Strickland's two part test also applies to guilty pleas.  Lafler v. Cooper, 132 S.Ct. 1376, 1384 (2012) (citing Hill v. Lockhart, 474 U.S. 52, 58 (1985)).  In applying Strickland, the court may dispose of an ineffective assistance claim if a defendant fails to carry his burden on either of the two prongs.  Strickland, 466 U.S. at 697; Brown v. United States, 720 F.3d 1316, 1326 (11th Cir. 2013).

In determining whether counsel's conduct was deficient, this court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688; *see also* Dingle v. Sec'y for Dep't of Corr., 480 F.3d 1092, 1099 (11th Cir. 2007).  Reviewing courts are to review counsel's performance in a highly deferential manner and "must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." Hammond v. Hall, 586 F.3d 1289, 1324 (11th Cir. 2009) (quoting Strickland, 466 U.S. at 689); *see also* Chandler v. United States, 218 F.3d 1305, 1315–16 (11th Cir. 2000)

(discussing presumption of reasonableness of counsel's conduct); <u>Lancaster v.</u>
<u>Newsome</u>, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not
entitled to error-free representation").  Counsel's performance must be evaluated with a
high degree of deference and without the distorting effects of hindsight.  <u>Strickland</u>, 466
U.S. at 689.  To show counsel's performance was unreasonable, a defendant must
establish that "no competent counsel would have taken the action that his counsel did
take."  <u>Gordon v. United States</u>, 518 F.3d 1291, 1301 (11th Cir. 2008) (citations
omitted); <u>Chandler</u>, 218 F.3d at 1315.  When examining the performance of an
experienced trial counsel, the presumption that counsel's conduct was reasonable is
even stronger, because "[e]xperience is due some respect."  <u>Chandler</u>, 218 F.3d at
1316 n.18.

       With regard to the prejudice requirement, defendant must establish that, but for
counsel's deficient performance, the outcome of the proceeding would have been
different.  <u>Strickland</u>, 466 U.S. at 694.  For the court to focus merely on "outcome
determination," however, is insufficient; "[t]o set aside a conviction or sentence solely
because the outcome would have been different but for counsel's error may grant the
defendant a windfall to which the law does not entitle him."  <u>Lockhart v. Fretwell</u>, 506
U.S. 364, 369–70 (1993); <u>Allen v. Sec'y, Fla. Dep't of Corr.</u>, 611 F.3d 740, 754 (11th
Cir. 2010).  A defendant therefore must establish "that counsel's errors were so serious
as to deprive the defendant of a fair trial, a trial whose result is reliable."  <u>Lockhart</u>, 506
U.S. at 369 (quoting <u>Strickland</u>, 466 U.S. at 687).  Or in the case of alleged sentencing
errors, a defendant must demonstrate that there is a reasonable probability that, but for

counsel's errors, the result of the proceeding would have been less harsh due to a reduction in the defendant's offense level. Glover v. United States, 531 U.S. 198, 203–04 (2001). A significant increase in sentence is not required to establish prejudice, as "any amount of actual jail time has Sixth Amendment significance." Id. at 203.

To establish ineffective assistance, Defendant must provide factual support for his contentions regarding counsel's performance. Smith v. White, 815 F.2d 1401, 1406–07 (11th Cir. 1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the Strickland test. See Boyd v. Comm'r, Ala. Dep't of Corr., 697 F.3d 1320, 1333–34 (11th Cir. 2012); Garcia v. United States, 456 F. App'x 804, 807 (11th Cir. 2012) (citing Yeck v. Goodwin, 985 F.2d 538, 542 (11th Cir. 1993)); Wilson v. United States, 962 F.2d 996, 998 (11th Cir. 1992); Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991); Stano v. Dugger, 901 F.2d 898, 899 (11th Cir. 1990) (citing Blackledge v. Allison, 431 U.S. 63, 74 (1977)).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail . . . are few and far between." Chandler, 218 F.3d at 1313. This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted. Dingle, 480 F.3d at 1099; Williamson v. Moore, 221 F.3d 1177, 1180 (11th Cir. 2000). "Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would

have chosen it.'" Dingle, 480 F.3d at 1099 (quoting Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983)).  The Sixth Circuit has framed the question as not whether counsel was inadequate, but rather whether counsel's performance was so manifestly ineffective that "defeat was snatched from the hands of probable victory."  United States v. Morrow, 977 F.2d 222, 229 (6th Cir. 1992).

Although section 2255 mandates that the court conduct an evidentiary hearing "unless the motion and files and records conclusively show that the prisoner is entitled to no relief," a defendant must support his allegations with at least a proffer of some credible supporting evidence.  See Chandler v. McDonough, 471 F.3d 1360, 1363 (11th Cir. 2006) (citing Drew v. Dep't of Corr., 297 F.3d 1278, 1293 (11th Cir. 2002) (referring to "our clear precedent establishing that such allegations are not enough to warrant an evidentiary hearing in the absence of any specific factual proffer or evidentiary support"); Hill v. Moore, 175 F.3d 915, 922 (11th Cir. 1999) ("To be entitled to an evidentiary hearing on this matter [an ineffective assistance of counsel claim], petitioner must proffer evidence that, if true, would entitle him to relief.")); Ferguson v. United States, 699 F.2d 1071, 1072 (11th Cir. 1983).  A hearing is not required on frivolous claims, conclusory allegations unsupported by specifics, or contentions that are wholly unsupported by the record.  Peoples v. Campbell, 377 F.3d 1208, 1237 (11th Cir. 2004); Tejada, 941 F.2d at 1559; Holmes v. United States, 876 F.2d 1545, 1553 (11th Cir. 1989) (citations omitted).  Likewise, affidavits that amount to nothing more than conclusory allegations do not warrant a hearing.  Lynn, 365 F.3d at 1239.  In this case,

the court held an evidentiary hearing, but limited the scope of the hearing to Defendant's first claim for relief.

***Ground One:  Failure to File an Appeal***

The issue of counsel's duty and obligation with respect to his client's right to appeal has been well litigated.  The Supreme Court has unequivocally stated that if a defendant specifically instructs his attorney to file a notice of appeal, a lawyer who disregards this instruction acts in a manner that is professionally unreasonable.  Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (citing Rodriguez v. United States, 395 U.S. 327 (1969); Peguero v. United States, 526 U.S. 23, 28 (1999)).  Since a defendant whose lawyer fails to file an appeal upon request has been denied an entire judicial proceeding, prejudice is presumed and the defendant is entitled to a belated appeal. *Id*. at 483; Gomez-Diaz v. United States, 433 F.3d 788, 792 (11th Cir. 2005); Cunningham v. United States, 378 F. App'x 955, 957 (11th Cir. 2010).

However, in cases where a defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, counsel's performance can still be constitutionally deficient if counsel failed to consult with the defendant regarding an appeal.  Flores-Ortega, 528 U.S. at 478.  Consultation involves "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." *Id*.  If counsel has consulted with the defendant, of course, the question of deficient performance is easily answered; counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal. *Id*.

In this case, consultation is not at issue.  Rather, Defendant asserts that he expressly instructed counsel to file an appeal and counsel failed to follow this instruction.

### *The Written Record*

On Defendant's § 2255 motion form, he claims that counsel failed to file an appeal as requested, and that counsel "failed to file the appeal until the date to file it expired" (Doc. 83 at 4.)[6]  Defendant's allegation in his memorandum is slightly different. In his memorandum Defendant states that counsel did not file a notice of appeal and "misrepresented the facts to Defendant until the time to file the appeal expired." (Doc. 88 at 2.)  The sentencing transcript reflects that the court advised Defendant that he had the right to appeal and that any appeal had to be filed within 14 days. (Doc. 92 at 24.) The Court also advised the Defendant that the clerk would immediately file a notice of appeal in his behalf upon request.  The Court said:  "I strongly suggest that before you and Mr. Davis part today, that you and he take time to talk so that he has a clear understanding of any directions that you have about the possibility of appeal so that for whatever reason that 14-day deadline is not missed; you understand that?" (*id*.). Defendant responded that he did (*id*.) Defendant now states that after this colloquy, he asked counsel to file the notice of appeal.

In addition to the memorandum, Defendant submitted a supporting affidavit in which he attests under oath that after sentencing he requested that his lawyer file a

---

[6] The record does not reflect that counsel (or the clerk) filed a notice of appeal at any time, timely or otherwise.

notice of appeal and that counsel told him that he would do so. (Doc. 88 at 9.)

Defendant explains that he was waiting for his appeal to be decided, but when he did

not hear from counsel or the appellate court, he had unidentified individuals inquire

about the status of his appeal, and he thus learned that counsel had not filed the notice

of appeal. (*id*.)  Defendant did not pinpoint the date when he learned that no appeal had

been filed, but he stated that when he learned of this, it was too late for him to pursue

his appeal.

      The Government submitted the affidavit of defense counsel Clifford Davis in

opposition to Defendant's motion. (Doc. 93 at 28–29.)  In his affidavit, Mr. Davis states

that he discussed the issue of appeal with his client and they reached "mutual

agreement . . . not to file an appeal since the sentence was within the guideline range

and less than the mandatory minimum." (*id*. at 28.)  Mr. Davis asserts that "Defendant is

mistaken in his assertion that Counsel failed to file an appeal despite being asked to do

so." (*id*.)

      In his reply, without explaining in what manner Defendant claims that counsel's

affidavit is "completely false." (Doc. 102 at 4.)  Defendant explains that he was

dissatisfied with the sentence he received because the 5K motion did not provide him

the benefit he expected, and he "directly asked" counsel to file an appeal. (*id*. at 4–5.)

      Defendant also supplemented his motion with sworn affidavits from his mother

and his wife, each of whom avers that they spoke with counsel about Defendant's

appeal.  Defendant's mother Sherry Webb states that she personally spoke with

counsel directly after sentencing and told him that Defendant wanted to file an appeal.

(Doc. 105 at 3.)  Ms. Webb recounts that counsel told her that he would be filing the

notice of appeal that day. (*id*.)  Cecilia Webb, Defendant's sister, states in her affidavit

that she called counsel's office, also on June 2, 2010, and told counsel that Defendant

wanted to appeal his case. (*id*. at 4.)  Cecilia Webb states that Defendant's attorney

told her that he had spoken with another family member after sentencing who had told

him that Defendant wanted to appeal, and he would be filing the notice of appeal that

day. (*id*.)[7]

### *The Evidentiary Hearing*

Defendant testified that Charles Lammers of the Office of the Federal Public

Defender initially had represented him and reviewed a "confidential informant letter"

with him.  Defendant already had been charged in this case when he traveled to Atlanta

to conduct a drug transaction in cooperation with the Government.  After the trip,

Defendant retained Clifford Davis, who was referred to him by a mutual friend.

Defendant's said there was no specific retainer agreement, although he thought that the

price he paid would cover counsel filing an appeal.

Defendant testified that he was in custody when the superseded charges were

filed.  He stated that he was upset because the additional information providing the

basis for the superseding indictment came from statements he made to law

enforcement, after agents had given him a verbal agreement that the information would

not be used against him.  He explained that Davis urged Defendant not to bring the

---

[7] The affidavits of Defendant's mother and Defendant's sister do not specifically
support Defendant's assertion that he <u>personally</u> told counsel that he wanted to appeal.

matter to the court's attention because of Defendant's hope of receiving a 5K1 motion, which could result in a significant reduction in his sentence. Defendant testified that law enforcement had told him about the 5K1 motion and how it could help him, but that counsel did not really explain it to him in detail other than saying it was a "cut for your time." Defendant's recollection was that counsel advised Defendant to plead guilty and said that he would raise the objections later, after the 5K1 was filed. Counsel also told Defendant if he got more than 15 years, counsel would bring up the issues of concern, but counsel told Defendant with the 5K1 his sentence most likely would not exceed 15 years imprisonment.

Defendant testified that counsel went over the plea agreement with him, but he denied that counsel had explained the Sentencing Guidelines to him. Defendant said that he did not have an understanding of the Sentencing Guidelines at the time of sentencing, although he does now. Defendant said that he saw the 295 months in the first PSR, and counsel told him not to worry because the 5K1 would trump all that.[8] Defendant testified that he should have been held accountable for 410 grams of powder cocaine and 91 grams of crack, but that counsel later told him the Government

---

[8] The only reference in the PSR to 295 months is contained in the "Substantial Assistance Sentencing Recommendation." (Doc. 58 at 22.) Although the five-page recommendation is included, perhaps inadvertently, in the copy of the PSR that was filed electronically after sentencing, it is the customary practice of the Probation Office to disclose the Sentencing Recommendation only to the presiding district judge and not to the parties. Therefore, it is unlikely that Defendant had access to, and thus would have asked counsel about, this specific recommendation as he recalled. The portion of the PSR that would have been disclosed to the defense noted minimum terms of life imprisonment on Counts 1 and 2, and a guideline range of 262 to 327 months (PSR ¶¶ 81–83). As had been explained to Defendant by counsel, the 5K1 trumped the statutory mandatory minimum life terms.

was saying 456 grams of crack and 56 grams of powder.[9]  Defendant said he never

"went forward" on those quantities, but that counsel told him once Defendant received

the 5K1, it would all be straightened out.  Counsel told Defendant that they could

appeal the court's assessment of the weight of the drugs if the sentencing did not go

well, but that counsel did not want to object at sentencing and hurt Defendant's

chances of receiving the benefit of a 5K1.  Therefore, because Defendant concurred,

counsel did not object to the quantity at the time, in accordance with Defendant's

instructions.  Defendant also testified that counsel told him that Paragraph E of the plea

agreement showed that the Government would not use the information Defendant

provided during his cooperation against him.[10]  Defendant says he told counsel that he

did not really trust the Government, but counsel assured him he could still make the

quantity arguments on appeal.

--------

[9] The statement of facts signed by Defendant acknowledges that the Government seized 450.80 grams of cocaine base and 56.90 grams of cocaine powder from inside his residence and in a rental vehicle parked outside the residence. (Doc. 30 at 2.)  The November 5, 2009, affidavit in support of the criminal complaint reflected that law enforcement seized 43 grams of cocaine base, 410.9 grams of cocaine powder and 302.6 grams of MDMA from the kitchen area of Defendant's residence. (Doc. 2 at 2.) The indictment returned on December 1 charged Defendant with offense conduct involving more than 5 kilograms of cocaine and more than 50 grams of cocaine base. (Doc. 13.)

[10] Paragraph e of the agreement provides: "Nothing in this agreement shall protect the Defendant in any way from prosecution for any offense committed after the date of this agreement.  Should the Defendant be charged with any offense alleged to have occurred after entry into this agreement, any statements, information or other evidence disclosed to the Government during the Defendant's cooperation may be used against the Defendant in any such prosecution." (Doc. 29 at 3.)

Defendant testified that he did not meet with counsel from the time he entered the plea until his sentencing. Defendant said that when he talked to counsel immediately prior to the sentencing proceeding he asked counsel to address the issue of immunity and the weight of the drugs. Counsel explained Defendant's 5K1 and how that would affect his sentence and again told Defendant if he got more than 15 years that they would appeal and get everything straightened out.

Defendant testified that counsel "left him blind" with a lot of things. For instance, he said that counsel did not explain his appellate rights before the hearing, did not tell him that counsel had to file an objection in order to get something heard on appeal, and did not explain the difference between a notice of appeal and an actual written appeal. Defendant conceded that the judge advised him of his appellate rights.[11]

Defendant testified that after sentencing, before the marshals escorted him from the courtroom, Defendant told counsel to appeal. He stated that he said this during a five or ten minute conversation. Defendant testified that he specifically recalled telling counsel to appeal and that counsel told Defendant that he would appeal. Defendant stated that did not see counsel in the weeks following sentencing, and heard nothing else from counsel. He said he received no correspondence of any kind from counsel, whether a copy of his judgment or the notice of appeal. Defendant stated that after sentencing he was unable to contact his wife or mother, both of whom had been in the

---

[11] In addition to the court's comments at sentencing regarding Defendant's right to appeal (Doc. 92 at 24), as part of the plea colloquy the court advised Defendant that if he entered a guilty plea he would be able to appeal the sentence. (Doc. 107 at 6.)

courtroom, so he called his sister and asked her to contact counsel and see if he filed the appeal.  He testified that he also told his mother in the courtroom not to worry, but to be sure counsel "put the appeal in."  Defendant said that he did not try to contact counsel until he got to USP Lompoc, which was about one or two months after sentencing. Defendant stated that he sent counsel a letter for the first time after he arrived at USP Lompoc, and then he called, because before he did not have a chance to call counsel. Defendant noted that when he was temporarily at the BOP facility in Atlanta, he was locked up 23 hours per day, which handicapped his efforts at communication.

In the first letter Defendant wrote to counsel after arriving at USP Lompoc, he asked counsel whether he forgot to file the appeal.  Defendant said that he never received a response to that letter, or several others he sent.  He testified that he only received a response if he sent his correspondence via certified mail.  Defendant related that at some point he sent a letter via certified mail, and asked counsel for his transcripts because he was going to file, or had filed, a 2255.

Defendant testified that he believed the appeal was underway until he got to USP Lompoc.  He explained that he did not think counsel was leading him on, that they had talked about the appeal "through the whole setting," and that the appeal was "already paid for because it was in the price."  When questioned at the evidentiary hearing about the cost of the appeal being included Defendant responded "yeah, he told me at the beginning about, you know, to file an appeal."

Defendant was asked when he realized that a notice of appeal had not been filed but did not offer a clear answer.  He stated that when he heard from counsel after his first letter, he phoned him, which was not longer than 60 days after sentencing. Defendant explained because he knew counsel from a mutual friend, he was trying to talk to counsel in a non-confrontational manner.  He said he asked counsel what was going on and why he had not heard from him.  Counsel told him not to worry, that counsel could get Defendant's issues heard through other motions, but Defendant's recollection was that counsel did not offer a direct response to the question of whether he had filed an appeal.  Defendant explained that he was not worried because Mr. Davis was the lawyer, and Defendant did not know what kind of motions could be filed or presented to get him relief, so he preferred to have counsel "on his team" rather than not.  Defendant admitted that he did not understand the law and said that although counsel had not explained the law to him, once counsel told him that they were going to pursue another avenue for relief, he knew that he had lost the right to appeal.

Defendant testified that he told counsel that he would send some cases in the mail so counsel could use them to file the post-conviction motion in Defendant's behalf. Defendant recalled that counsel told him that "would be great" and to send them. Defendant said he was hearing from prison law clerks that counsel could not file any motions but Defendant said that he was "going with," i.e. believing, Mr. Davis, who was his paid lawyer.  Defendant said that he was unclear on what kind of motion counsel intended to file, (he recalled "22 something") but he recalled that counsel reassured him that his issues would be heard by the court.

Defendant testified that after he wrote to counsel to inform him that Defendant intended to file a 2255, counsel did not respond to this letter.  Defendant stated that the law library clerk thought that counsel was stringing Defendant along and waiting for the time to run out for filing a § 2255 motion, as counsel had done with the appeal. Defendant therefore sent counsel a certified letter and after about two months counsel sent Defendant all of his legal materials.

Defendant testified that he never came right out and accused counsel of failing to file the notice of appeal, although he had asked whether counsel had forgotten to file the direct appeal.  He also stated that when he brought up the issue of an appeal, counsel never said anything like "we talked about this, there was no reason to appeal." When they talked about the 2255, counsel told Defendant that he needed to do what he had to do. Defendant asked Davis if he knew a lawyer who could help with the § 2255 and counsel referred Defendant to a lawyer in Pensacola.

On cross-examination, Defendant testified that he did not tell Davis who Davis was authorized to talk to about Defendant's case.  Defendant said that counsel never specifically asked him if counsel could talk to other family members about the case, or which individuals he was authorized to discuss the case.

Defendant maintained that he signed the statement of facts in support of the plea agreement, although counsel did not go over it with him.  He admitted that he told the judge that he had reviewed the statement of facts with counsel even though this was not true. Defendant stated that he "did not know" he had signed the statement of facts, and that he "never saw" the statement of facts until he arrived at USP Lompoc.

When asked why he had told the court otherwise, Defendant asserted that he basically followed counsel's lead.

Contrary to his testimony on direct examination, Defendant testified that counsel came to the jail where he was temporarily housed one time between the time he entered his plea and his sentencing. During that meeting, they discussed the PSR and counsel asked Defendant if he had any issues with the PSR. Defendant recalled that he did not understand the marijuana equivalencies used to calculate the applicable guidelines range in the PSR, and he told counsel that he should not be held accountable for any quantities of drugs related to his cooperation. Defendant testified that he showed counsel the contract he had signed with Lammers. He explained that he also told counsel that the agents had told Defendant that if he provided information that the agents knew nothing about, they would not use it against him and it could help him on the first charge.

The Government asked Defendant if he was aware that he could continue to cooperate post sentencing. The Government noted that, in fact, Defendant did try to continue to cooperate as evidenced by at least one letter he wrote to counsel in which Defendant was offering to provide additional information against an individual who had been arrested. (*see* Hearing Ex. E 36–38.)

With respect to the calculation of the quantity of drugs attributed to him, Defendant noted that counsel told the court that the information upon which the drug weight was based had been provided by the Defendant and therefore that it should not be used against him. Defendant testified that counsel told him that counsel had never

seen a situation where a defendant received a 5K1 but the information provided during that defendant's cooperation was used against him.

On re-direct, Defendant testified that he answered the court's questions at the plea colloquy as he had been instructed by counsel.  He reiterated that the defense strategy was not to contest anything until the 5K1 was filed.

Sherry Webb, Defendant's mother, testified that she was present when Defendant was sentenced.  She talked to Mr. Davis on that day, and filed an affidavit about that conversation. (*see* Doc.105 at 3.)  She said that in speaking to counsel, she wanted to see if there was going to be another hearing to "get things straight,"and counsel responded to the effect that he would get things straightened out and he would let her know.  With respect to an appeal, Ms. Webb recalled that counsel said he had other cases ahead of Defendant's case but that he would get to his case.  Ms. Webb indicated that counsel was upset with her because she was upset with him about Defendant's sentence.

On cross-examination, Sherry Webb testified that she typed up the affidavit after talking to her son about it and then took it to a notary to sign it.

Cecilia Sheere Webb, Defendant's sister, was testified next.  Ms. Webb testified that she called Mr. Davis's office a single time about her brother's appeal.  She recalled that either the day of or the day after sentencing, she spoke to Defendant and he told her that he needed to appeal as soon as possible and asked that she call his attorney. Ms. Webb complied, although she was not sure whom she spoke to, and she could not recall whether she spoke to a male or female.  Cecilia Webb testified that she did not

type up the affidavit that was filed in support of Defendant's motion (Doc. 105 at 4), and she did not remember who typed it, but she confirmed that she signed it.

LaTonya Webb, who was married to Defendant during the proceedings in question,[12] was the last to testify for the Defendant.  She testified that she has a bachelor's degree in criminal justice, has worked as a county and state probation officer, was an intern investigator with the public defender's office, had been a financial investigator for the Department of Revenue, and was currently an Inspector General Investigator for the State of Florida. Ms. Webb said that she was in communication with Mr. Davis during her husband's criminal proceedings.  She stated that she went to Davis' office two times and called Mr. Davis a lot.  On the day of sentencing, she does not recall talking to Davis in court. She may have told him she would call him in light of the appellate deadline mentioned in court.  Ms. Webb said that her husband called her "all the time" asking her to call counsel to make sure he filed the appeal.  In this regard, Ms. Webb testified that through the course of the proceedings, it was common for Defendant to ask her to call counsel and tell him something, or ask counsel to come to see Defendant, so she would relay a message.  She stated that counsel neither brought up the issue of confidentiality nor told her that he could not talk to her about the case. With respect to her husband's appeal, Ms. Webb testified that she remembered talking

---

[12] From the phrasing of the questions at the hearing, it appears that Defendant and Ms. Webb may no longer be married, although the question was not directly asked. (Doc. 134 at 72, 80).

to counsel about Defendant wanting to appeal. When she spoke to counsel about the appeal, counsel gave her another attorney's phone number to call.

Ms. Webb did not recall filling out written paperwork or signing a retainer agreement to establish the scope of counsel's representation. She said that she understood that the payment made to counsel was for the whole case, from the beginning until it was resolved, which in her mind included filing an appeal. Ms. Webb also understood the defense strategy not to "upset" the Government until the 5K was filed.

On cross-examination, Ms. Webb testified that Defendant wanted her to talk to counsel about his case. She recalled getting phone calls from her husband almost immediately after Defendant returned to the facility where he was housed. Ms. Webb recalled telling counsel that Defendant wanted him to fil an appeal, and she said it was understood that he would file the appeal. When pressed about the conversation, she explained that while she did not remember him saying yes he was going to file the appeal, she was sure that he did not say no, because she did not tell her husband that Davis was not going to file an appeal.

The Government presented the testimony of Clifford Davis, Esq., Defendant's former counsel. Mr. Davis, testified that he was both a farmer and a lawyer and that he has been practicing federal criminal defense since 1977. He acknowledged having submitted an affidavit in response to Defendant's § 2255 motion in which he stated that after discussing the issue of an appeal, he and Defendant reached a mutual agreement not to pursue an appeal in this case. Mr. Davis testified that he was certain they had

discussed the issue of an appeal prior to sentencing because his practice is that when he reviews the PSR with his clients, he discusses the possible outcomes with his clients.  Counsel admitted that he did not specifically recall discussing the PSR with Defendant in this case.

Mr. Davis did, however, specifically recall discussing an appeal with Defendant on the day of sentencing.  Mr. Davis readily admitted that the Defendant told Mr. Davis he wanted to appeal.  According to Mr. Davis, both he and the Defendant were shocked by the lengthy sentence.   The immediate reaction from Defendant and his wife was that they should appeal.  Counsel explained that despite the seemingly harsh sentence, he was a proponent of not appealing for two reasons.  First, counsel did not believe that Defendant had a much of a chance of success because his sentence was within the guidelines range.  Second, counsel explained that although Defendant already had received the benefit of a 5K1, there was the potential that the Defendant would be a witness in a future prosecution, and thus an appeal would adversely impact his ability to continue to cooperate to further reduce his sentence. Counsel further explained that Defendant's criminal history suggested that there would potentially be a large number of individuals about whom the Defendant would have information so there should be a number of opportunities to cooperate to reduce his sentence.  Consequently, Mr. Davis testified that he advised Defendant his best chance for a further reduction in his sentence would be through a Rule 35 motion.  Mr. Davis stated that (at that time) Defendant trusted Mr. Davis' advice and for that reason Defendant ultimately agreed with counsel not to appeal.

Davis unequivocally testified that if Defendant had told him to appeal after that, he would have done so, regardless of whether Davis agreed with the wisdom of Defendant's decision.  As an experienced attorney, Davis advised that he was fully aware of the impact of not filing an appeal within the 14-day time period if requested to do so.  Separate from the discussion with the Defendant, Davis testified that Defendant's wife and possibly others had indicated during the interim time that "we should appeal the sentence."

Counsel's recollection was that the only family member Defendant had authorized counsel to discuss the case with was Defendant's wife. Davis stated that Defendant specifically told counsel not to talk to Defendant's mother about the case. Counsel speculated that at least part of the reason for this was that Defendant's mother was still living in the community and Defendant did not want her to have any problems because of his cooperation.  Davis stated that based upon Defendant's directive not to discuss the case with anyone else other than his wife, he was not authorized to act on anything the Defendant's mother told him, although he may have "given lip service" to other family members when they tried to discuss the case with him.

Davis acknowledged discussing Defendant's case with Defendant's wife, and acknowledges he had discussions with her about an appeal. Davis' telephone message records reflect that LaTonya Webb called him within the time period for filing an appeal, on June 14, and left a message indicating that she wanted to talk to counsel about

Mike's appeal.  (*see* Government's Exhibit E, presented at evidentiary hearing).[13] Counsel testified that he would not have filed an appeal just because Mrs. Webb asked him to.  If she had relayed to him that Defendant wanted an appeal, he would have visited Defendant to discuss the matter with him.  Although counsel did not recall where the Defendant was housed he said that his recollection was that Defendant was at the Bay County Annex where he would have access to phones.[14]

Counsel remembers that Defendant told him on "several" occasions that he wanted to file an appeal, but each time after discussing the issue with counsel decided not to appeal. Counsel said that, based on those discussions over a period of time, and counsel's belief that they had reached mutual agreement, he did not file an appeal.

Counsel explained that because he was privately retained, he did not keep time records in Defendant's case.  Consequently, Davis did not have time records documenting when he received a phone call or when he visited the Defendant. Counsel noted that the phone log that was part of Exhibit E reflected a phone call from Defendant's wife, but he stated that any conversation he had with Mrs. Webb would not have changed his client's decision about an appeal.

---

[13] Exhibit E, introduced at the hearing, was part of Mr. Davis' client file for Defendant.  It was comprised of some phone message logs and correspondence from Defendant and his wife.  Exhibit E was not represented as the entirety of counsel's file in Defendant's case.

[14] The testimony was that Defendant was actually at Chipley and not the Bay County Annex.

Counsel was asked to address some of the letters contained in Exhibit E. The first letter in the file is dated September 1, 2010, well after the June 21, 2010 deadline for filing a notice of appeal does not mention anything about an appeal. (Ex. E at 4). Counsel stated that he recalled at some point after the time for filing an appeal expired, having a discussion with Defendant about the predicate offenses that were the basis for the career offender enhancement, and how those drove his guidelines calculations. He stated that these discussions took place either over the telephone or in person, because he went to see Defendant at least one time after sentencing before Defendant received his permanent designation.

The next letter was a two-page letter dated September 24, 2010 in which Defendant states that "even though I might have waived my rights I still can put in a direct appeal to check over the PSI but I don't think you know that or it just slipped your mind." (Ex. E at 6.) Defendant did not state in that letter that he had asked counsel to appeal. Davis said that it was "pretty obvious [Defendant] knew an appeal was not pending" at the time he wrote that letter. The letter referenced conversations counsel had with Defendant in which counsel advised Defendant that he would need to raise issues by filing a § 2255 motion or a motion for some other post-conviction relief.

On December 12, 2010, Defendant sent counsel a letter stating that counsel had not sent him "anything regarding a direct appeal" although over six months had elapsed. Defendant asked "is everything in the working?" (Ex. E at 7.) Davis said this was the first time he had any indication that Defendant thought there might be an

appeal pending.  However, by this time, Mr. Davis already had a conversation with
Defendant about filing a § 2255 motion.

On January 31, 2011, counsel sent a letter to Defendant telling him essentially,
that the predicate offenses were not improper. (Ex. E at 8.)  Counsel testified that this
letter was in response to questions Defendant previously had raised. According to
Davis, Defendant likely wrote this letter after discussing the matter with other federal
practitioners.

The next correspondence from Defendant before Defendant filed his  § 2255
motion was an undated handwritten letter Davis received on May 2, 2011. (Ex. E at 9.)
The letter reflects that Davis and Defendant had spoken by telephone on the date
Defendant wrote the letter and identifies several issues that Defendant intended to raise
in a § 2255 motion including that counsel did not explain or file his direct appeal for him,
failed to explain the "plea bargain" and incorrectly predicted Defendant's sentence
would be less than 15 years. (Ex. E at 10.)[15]  Defendant apparently was unsure whether
counsel had received that letter and he sent another letter to counsel, along with
several attachments, which counsel received on May 13, 2011. (Ex. E at 12–32.)

The last item of correspondence in Exhibit E is a letter from Defendant that
counsel received on February 13, in an year unspecified. (Ex. E at 36–37.) In this letter,
Defendant asked for counsel's assistance in securing his ability to testify against
another individual, who had been arrested and whose case was pending trial.  From the

---

[15] It appears that at least one page of the letter is missing, as the letter does not
"flow" from page two to the unnumbered next page.

photocopy of the letter in the Government's exhibit, it appears that someone from counsel's office attempted to locate the case involving the individual in question and put a "sticky" note on the letter reflecting that there was no criminal case on the named individual. (*id.*)  According to Davis, because Defendant was still cooperating, counsel would have passed along or otherwise followed up on any potentially helpful information, but in this instance he was unsuccessful in locating a pending case involving either the individual or the agent that Defendant identified.

Counsel reiterated that he discussed with his client how the guidelines worked before Defendant entered his plea.  Counsel stated that by the time he became involved in the case, there was no "trial case" left because Defendant already had made his custodial statements to law enforcement without the benefit of Rule 11 and engaged in the controlled buy, thus, committing himself to a course of cooperation.  At that juncture, counsel's focus was on minimizing Defendant's sentencing exposure, not securing an  acquittal.  Because of the factual circumstances of the case, counsel stated that his discussions with Defendant focused on pre-plea cooperation.  Counsel testified that he told Defendant that it was important to provide full and truthful cooperation, and that this was the only way to receive a sentence below the mandatory minimum life sentence. Counsel advised Defendant that it was up to the Government whether to file the substantial assistance motion, and up to the judge to act on it. Counsel conceded that he may have made a general prediction about the sentence Defendant could expect to receive but stated that he was "not reckless enough" to have predicted a specific term, rather than a general estimate.  Counsel denied that he told

Defendant if he was sentenced to a term of more than fifteen years, that counsel would appeal.

Counsel also testified that prior to Defendant entering the plea, counsel reviewed the plea agreement and the statement of facts with him.  With respect to the statement of facts, counsel said that he may not have told Defendant that by signing the document he would be admitting the truth of what was in the statement of facts because some judges view the statement of facts as an admission that this is what the Government can prove, rather than an outright admission.  Counsel denied that he told Defendant to agree with whatever the judge said in any court proceeding, and instead  instructed his client to answer truthfully.

On cross examination, counsel testified that to prepare for the hearing, he went back to the file and pulled documents, and that he also had spoken to counsel for the Government.  He acknowledged that Government's Exhibit E was not his entire case file, and said that he had not looked at the entire case file in preparation for the evidentiary hearing, although he had gone through it before preparing the affidavit. Counsel stated that he was sure there was a standard retainer agreement in the file, and that his standard agreement does not mention appellate representation.   Instead, the retainer agreement provides that counsel will represent the client through trial or disposition of the case at the trial level.  Counsel does not consider himself to be an appellate attorney, and explained that his normal practice is to "tickle" a case fourteen days from the date judgement was entered.  He ordinarily does not write a letter to his clients to advise them of the suspense date because the clients are typically moved to

another facility before the letter has time to reach them, and thus it is impractical.

Counsel explained that he always discusses the case and strategy with his clients

beforehand, then he lets them digest what has happened at sentencing before having

another discussion a couple days later.  In this case, counsel recalls that he was

optimistic about Defendant's likely sentence in light of his cooperation, and noted that

before sentencing there was no reason to think that Defendant would want to file an

appeal.  Counsel admitted that in court, after sentencing, Defendant told him that he

wanted to appeal, and noted that if Defendant's family members had told him to appeal,

the only one he might have listened to would have been LaTonya Webb.

Counsel did not recall exactly when he and Defendant had their post sentencing

meeting to discuss the issue of an appeal.  Upon further questioning counsel stated that

he was unsure whether he saw Defendant in person or they discussed the issue by

phone, but he was certain that they had a conversation about not filing an appeal.

Counsel reiterated that after he heard from a number of people that Defendant wanted

to appeal, he was also certain that he contacted Defendant or they would not have had

the correspondence they had. (Doc. 134 at 121.)  Counsel said that he and his client

had back and forth discussions about the pro's and con's of pursuing an appeal, but he

could not recall how many times, because he was relying on his memory rather than

documentation in the case file.

The phone records included in Exhibit E included a message from Latonya

Webb noting that she wanted to talk to counsel about the appeal.  Counsel testified that

he did not recall the exact nature of Ms. Webb's phone call, or whether she was calling

to express her own opinion that an appeal should be filed, or she was relaying a message from her husband.  When asked if Ms. Webb could have called to say that she had talked to her husband again and he does want to appeal, counsel unequivocally stated that this could not be the case, because if it were, a notice of appeal would have been filed immediately.

Counsel noted that a defendant could not object to the factual matters such as the amounts of drugs at sentencing without risking losing the 5K motion.  Therefore, the defense filed no objection to drug weights to preserve the prospect of benefitting from both the 5K and preserving the opportunity of future cooperation.

Counsel testified that he was not sure whether he responded to Defendant's letter of December 12, 2010 in which Defendant asked about his appeal, despite the fact that Defendant appeared from this letter to be under an erroneous impression of what was going on in his case.  By way of explanation, counsel stated that he may not have responded because he suspected that Defendant had been "in the presence of other inmates with more legal knowledge" than counsel had and that Defendant was laying the groundwork for filing a 2255 by sending the letter.

On re-direct, counsel reconfirmed that he would not have told Defendant to agree to any drug weight at all merely to get a 5K motion.  However, counsel reiterated that, based on the discovery and Defendant's admissions to law enforcement, there was nothing to fight.  He noted that in trying to get the best possible sentence for one's client it is not necessarily prudent to litigate every issue.  In this case, there was no basis for a motion to suppress and the consequences could have been worse than the

cure if they tried to object to drug weight.  Counsel noted that the Government seemed to hold co-defendant Stacey Stembridge in more favor than Defendant, even though counsel characterized Stembridge as a bigger player in the conspiracy.[16]

Although there are some points upon which the parties agree, the testimony presented at the hearing cannot be fully reconciled, thus requiring the court to make a credibility determination.  To do so, the court must weigh the testimony of the witnesses in light of all the facts and circumstances of the case, taking into account their interests in the outcome of the proceedings, the consistencies or inconsistencies in their testimony and their demeanor on the stand.  United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002).  There are internal inconsistencies within the testimony of both Defendant and counsel.

There is no dispute that Defendant expressed a desire to appeal, and that he asked both his wife and his sister to communicate or reiterate this desire to counsel. The undersigned credits the testimony of both women that they relayed such messages to counsel.  The fact that Defendant, either personally or through his family members, told counsel to file an appeal on multiple occasions also corroborates counsel's testimony that Davis and the Defendant had more than one discussion about whether to file an appeal, as Defendant was vacillating in his decision.  Counsel offered well-

---

[16] Stembridge pleaded guilty to a lesser included offense of Count 1 of the indictment, conspiracy to distribute and possess with intent to distribute more than 500 grams of cocaine.  He was not held accountable for any crack cocaine and ultimately received a sentence of 87 months imprisonment, which was at the top of the applicable guidelines range. (see Docs. 60, 62.).  His appeal of his sentence as unreasonable was unsuccessful. (see Doc. 80.)

founded reasons why he was not a proponent of filing an appeal, testified that he and Defendant had discussed the disadvantages of filing an appeal, and stated unequivocally that he and his client reached mutual agreement not to pursue an appeal. Notably, Defendant never denied, or even commented about, counsel's testimony in this regard. On the other hand, the Defendant stated and Davis acknowledged that the Defendant always relied upon counsel's advice, thus suggesting that if Davis had advised Defendant it was not in Defendant's interest to appeal, it is reasonable to conclude that the Defendant would have followed this advice, rather than instructing his attorney to take action contrary to the advice of his lawyer.

The disputed facts in this case do not concern whether the Defendant told Davis to file an appeal. Defendant testified he did so and Davis readily admits that the Defendant told him to file an appeal immediately after sentencing during the discussion in the courtroom. The gap in Defendant's testimony, however, is not whether he told Davis to file an appeal but rather what Davis advised him after Defendant said he wanted to appeal. Despite Davis' unequivocal affidavit and testimony at the hearing that he advised Defendant not to appeal after the Defendant brought up the issue, Defendant never testified in direct nor presented rebuttal testimony denying that Davis discussed with him against filing an appeal and Defendant went along with the advice. Rather, the Defendant testified only that he told Davis to file an appeal and made no mention of nor denied that his counsel discussed with him the disadvantages of filing an appeal. Indeed, the Defendant did not offer a credible explanation as to why he did not inquire about the status of the appeal until months after sentencing. Further, there is no

mention of the status of an appeal in the initial letters Defendant sent to counsel.

Surely, if Defendant was under the impression an appeal had been filed he would have

made inquiry and would have in the initial letters inquired as to the status of the appeal.

It was not until December 2010 that Defendant mentioned that an appeal was pending.

It is fairly obvious from the language used in this letter that the Defendant (with the

assistance of someone else) was making inquiry about the appeal as a predicted to

filing a 2255 motion.

There is no question that viewed objectively, under the circumstances of this

case, continued cooperation rather than an appeal held the greatest likelihood of a

favorable outcome for Defendant.  The PSR reflected that between November 1, 2006

and November 4, 2009, Defendant admitted that he had made 30 trips to Atlanta,

purchasing one half kilogram of cocaine each time (PSR ¶¶ 8, 9). Defendant

Stembridge was only involved in, or at least only held accountable for, a fraction of that

activity. (doc. 62 at 15.)  Because Stembridge obviously was not Defendant's only

supplier, Defendant presumably could have provided information about other

individuals with whom Defendant had direct dealings.  Furthermore, Defendant's

continued interest in cooperation is reflected in correspondence to counsel that was

mailed well after the time frame had expired for filing an appeal. (Ex. E at 36–37.)  Ther

is little question that continued efforts at cooperation would have been inconsistent with

pursuit of an appeal.

In sum, the court finds that while there is no dispute Defendant requested Davis

to file an appeal, Defendant failed to rebut Davis' testimony that after Defendant

requested Davis to appeal, Davis discussed with Defendant  the disadvantages to filing an appeal and that Defendant agreed – as he had throughout the course of the representation – an appeal would not be in Defendant's best interests and, therefore, that an appeal would not be filed.

Because the Court concludes counsel did not fail to file an appeal contrary to the express directive of his client, the Defendant has failed to show that Davis's representation was ineffective under Roe v. Flores-Ortega and, therefore, Defendant's request for relief on Ground One should be denied.

### Ground Two–Failure to object to use of immunized information

In his second ground for relief, Defendant contends that counsel was constitutionally ineffective because he failed to object to the PSR's use of "immunized information" that was given during cooperation to enhance the offense level.  After Defendant's arrest by state law enforcement, federal agents took over the case. Defendant states in his affidavit that the federal agents indicated to him that if he agreed to work for them, they would "help [him] out with the current charges and that anything [he] did or said during the course of [his] working with them would not be used against [him]." (Doc. 88 at 8.)  Defendant says that because he wanted to be with his family, he took the agents at their word and agreed to "do some field work for them." (*id*.)  Under the supervision of federal agents, Defendant negotiated a deal for two kilograms of cocaine from a trafficker in the Atlanta, Georgia area, who was arrested immediately. (*id*.)  During a conversation on the return trip to Florida, Defendant told agents that his previous dealings with the individual in question involved three to five

kilograms of cocaine. (*id*. at 9.)  Defendant states that based on this information, he was subsequently charged with conspiracy, in addition to possession. (*id*.)

Although Defendant's description of the events in question was sworn under penalty of perjury, the description in the supplement to his § 2255 motion retreats from this position. In his supplement Defendant claims that, in its response, the Government revealed a "new fact that supports a claim previously unavailable" to him, that is "the information he provided was 'not' immunized." (Doc. 104 at 1.)  Defendant thus attempts to reframe his claim as alleging that counsel was constitutionally ineffective because counsel did not ensure either that (1) Defendant was immunized or (2) that Defendant understood he was not immunized before he agreed to cooperate with the Government.

Regardless of the manner in which Defendant frames his claim, he is not entitled to relief because he cannot show prejudice.  The fact of the matter is that any additional information Defendant provided about his drug dealing activities did not augment his sentencing exposure.  The PSR reflects that a November 4, 2009, search of Defendant's residence yielded 56.90 grams of cocaine powder and 450.6 grams of cocaine base. (Doc. 58, PSR ¶¶ 7–8.)  At the time of Defendant's sentencing, possession of 50 grams or more of a mixture or substance that contained cocaine base triggered penalties set out in 21 U.S.C. § 841(b)(1)(A)(iii).[17]   Notably, because

---

[17] This section was amended effective August 2, 2010 such that it applied only to offense conduct involving 280 grams or more of cocaine base.  In light of the quantity of cocaine base found in Defendant's apartment, this amendment would have had no impact on Defendant's  sentence.  21 U.S.C. § 841(b)(1)(A)(iii) (effective August 2, 2010).

Defendant had two or more prior felony convictions, he was subject to a statutory mandatory term of life imprisonment, based on the drugs recovered from his apartment alone.  21 U.S.C. § 841(b)(1)(A). The additional drugs attributed to Defendant made no difference in his maximum exposure. He already was subject to a mandatory life sentence.  Indeed, Defendant ignores the fact that it was actually his willingness to cooperate with law enforcement that led the court to impose a sentence below a mandatory life sentence.

It is well-established that counsel is not constitutionally ineffective for failing to preserve or argue a meritless claim.  Freeman v. Attorney General, Florida, 536 F.3d 1225, 1233 (11th Cir. 2008); *see also* Sneed v. Florida Dep't of Corrections, 496 F. App'x 20 (11th Cir. 2012) (failure to preserve meritless Batson claim not ineffective assistance of counsel);  Lattimore v. United States, 345 F. App'x 506, 508 (11th Cir. 2009) (counsel not ineffective for failing to make a meritless objection to an obstruction enhancement); Brownlee v. Haley, 306 F.3d 1043, 1066 (11th Cir. 2002) (counsel was not ineffective for failing to raise issues clearly lacking in merit); Chandler v. Moore, 240 F.3d 907 (11th Cir. 2001) (counsel not ineffective for failing to object to "innocuous" statements by prosecutor, or accurate statements by prosecutor about effect of potential sentence); Meeks v. Moore, 216 F.3d 951, 961 (11th Cir. 2000) (counsel not ineffective for failing to make meritless motion for change of venue); Jackson v. Herring, 42 F.3d 1350, 1359 (11th Cir. 1995) (counsel need not pursue constitutional claims which he reasonably believes to be of questionable merit); United States v. Winfield, 960 F.2d 970, 974 (11th Cir. 1992) (no ineffective assistance of counsel for failing to

preserve or argue meritless issue).  Therefore, because Defendant was subject to a

mandatory life sentence – with or without including drugs from other trips – challenging

the amount of drugs would not have made any difference and therefore Defendant's

claim is due to be denied.

### Ground Three–Failure to object to application of Career Offender Enhancement

Defendant contends that counsel was constitutionally ineffective because he

failed to challenge the applicability of the career offender guideline.  He asserts that in

applying the guideline, the probation officer improperly relied on a conviction that was

more than fifteen years old and/or a conviction that occurred when he was under

eighteen years old.

Section 4B1.1 of the Sentencing Guidelines provides that a defendant is a career

offender if the defendant was at least eighteen years old at the time he committed the

offense of conviction; if the offense of conviction is a crime of violence or a controlled

substance offense and the defendant has at least two prior felony convictions of either

a crime of violence or a controlled substance offense.  U.S.S.G. § 4B1.1.  Defendant's

PSR identified three prior convictions that provided the basis for the career offender

enhancement (*see* ¶¶ 24, 43, 46, 47).  The PSR reflects that on October 15, 1991, at

the age of 16, Defendant was sentenced to fifteen years imprisonment for possession

of a controlled substance with intent to sell (PSR ¶ 43).  On January 17, 1995,

Defendant's motion for post-conviction relief in that case was granted and he was

resentenced to three years imprisonment with credit for time served (*id.*).  On March 11,

1998, at the age of 23, Defendant was sentenced to ten years probation for possession

of marijuana with intent to distribute (PSR ¶ 46).  On May 21, 1998, Defendant was adjudicated guilty of sale of cocaine and sentenced to time served (PSR ¶ 47).  The underlying offense conduct in the latter case took place in 1994 when Defendant was nineteen years old.  As discussed below, each of these three convictions was properly considered.

First, Defendant's age at the time of conviction is not the only dispositive factor. The commentary to § 4B1.2 provides that a conviction for an offense committed at age eighteen or older is an adult conviction, and that a conviction for an offense committed prior to age eighteen is an adult conviction if it is classified as an adult conviction under the laws of the jurisdiction in which the defendant was convicted. U.S.S.G. § 4B1.2 comment. (n.1).  Defendant's 1991 conviction for possession of a controlled substance with intent to sell was thus an adult criminal conviction regardless of his chronological age at the time.  He was also over the age of eighteen at the time of the other two convictions.[18]

Defendant's 1991 conviction is also properly considered because it was a "prior sentence of imprisonment exceeding one year and one month . . . that resulted in the defendant being incarcerated during any part of" the fifteen-year period preceding the defendant's commencement of the instant offense."  *See* U.S.S.G. § 4A1.2)(e).  The PSR reflects that Defendant was released from custody on or about January 17, 1995

---

[18] Defendant's assertion that he was "under 18" at the time of the offense identified in Paragraph 47 of the PSR (*see* doc. 102 at 7)  is factually mistaken.  Defendant was born on December 4, 1974, and the offense conduct took place on November 11, 1994, less than one month before Defendant's twentieth birthday (PSR ¶¶ 47, 68).

PSR ¶ 43).  Even if Defendant's offense conduct in this case is not calculated as having begun until November 4, 2009, the date of his arrest, he was incarcerated on the 1991 conviction within the fifteen year period preceding this date.  Thus, this conviction is properly counted.  Because counsel is not constitutionally ineffective for his failure to make a meritless objection, Freeman, Sneed, *supra,* Defendant's claim is due to be denied.

### ***Ground Four–Failure to object to criminal history category***

Defendant asserts that counsel was constitutionally ineffective because he failed to object to Defendant's criminal history category.  Defendant failed to include any facts or argument in his initial submission, but argues in his reply that the PSR reflects that he was assessed six criminal history points for convictions that are over fifteen years old. (Doc. 102 at 8.)  Criminal history points were properly assessed for the convictions identified in paragraphs 43 and 44 of the PSR because, as noted in the previous section, Defendant was in custody within fifteen years of his commencement of the instant offense. (*see* U.S.S.G. § 4A1.2(e)).  Regardless, because Defendant was properly determined to be a career offender, *see supra*, his criminal history category was automatically VI.  There was no viable legal objection for counsel to make to Defendant's criminal history category calculation and, therefore, counsel was not constitutionally ineffective for his failure to object.  Freeman, Sneed, *supra*. Defendant's request for relief on this claim is denied.

### _Ground Five_– _Illegal Sentence_

Defendant next claims that his sentence was "illegal and unreasonable" because the 5K1 downward departure "undermined the extent of [Defendant's] cooperation. (Doc. 83 at 8.)  Defendant has failed to provide any further factual support for, or legal argument in support of, this claim in either his initial motion and memorandum or in his reply.  In any event, absent an allegation of ineffective assistance of counsel in conjunction with this claim, it is procedurally barred, and does not afford Defendant relief.  _See_ Lynn, 365 F.3d at 1234–35; Bousley, 523 U.S. at 621;  McKay, 657 F.3d at 1195.

### _Ground Six_

Defendant contends that the "new crack law" and the 2010 emergency guidelines that were in effect at the time of sentencing applied to his case and that his sentence was improper.  Defendant is mistaken.  Neither the Fair Sentencing Act of 2010 ("FSA") nor the subsequent amendment to the guidelines was in effect at the time of Defendant's June 2, 2010, sentencing.[19]  Furthermore, the FSA is not retroactively applicable to defendants who were sentenced before its enactment.  _See_ United States v. Berry, 701 F.3d 374, 377 (11th Cir. 2012); United States v. Webster, 530 F. App'x 897 (11th Cir. 2013); United States v. Daniel, 503 F. App'x 804 (11th Cir. 2013) (citing Dorsey v. United States, 132 S.Ct. 2321 (2012); Berry, 701 F.3d at 377).  And, even if

---

[19] President Obama signed the FSA into law on August 3, 2010, and the Sentencing Commission promulgated an emergency amendment to the Sentencing Guidelines that was effective on November 1, 2010.

Defendant were sentenced today, as discussed above, regardless of the revision to the crack cocaine quantity tables, the guidelines calculations would still be trumped by the statutory mandatory term of life imprisonment based on the quantity of crack cocaine discovered at Defendant's home coupled with his two prior qualifying convictions.[20]

## CONCLUSION

For all of the foregoing reasons, the court concludes that Defendant has failed to show that any of the claims raised in his motion to vacate, set aside, or correct

---

[20] In his reply, Defendant attempts, for the first time, to assert that the facts in the PSR regarding the quantity and kind of drugs seized from his house were inaccurate. Failure to object to facts contained within PSR constitutes admissions of those facts for sentencing purposes. United States v. Patterson, 595 F.3d 1324, 1326 (11th Cir. 2010); United States v. Ndiaye, 434 F.3d 1270, 1300 (11th Cir. 2006); United States v. Gibson, 434 F.3d 1234, 1251 (11th Cir. 2006); United States v. Shelton, 400 F.3d 1325, 1330 (11th Cir. 2005) (citing United States v. Walters, 269 F.3d 1207, 1213 (10th Cir. 2001); United States v. Joshua, 40 F.3d 948, 952 (8th Cir. 1994)).  He attributes the lack of previous objection to counsel's ineffectiveness.  The same facts were set forth in the statement of facts that Defendant signed on February 3, 2010 (Doc. 30) and Defendant admitted under oath that the facts set forth therein were true. (Doc. 107 at 13).  Solemn declarations made under oath in open court carry a strong presumption of verity.  Blackledge v. Allison, 431 U.S. 63, 73–74 (1977); United States v. Medlock, 12 F.3d 185, 187 (11th Cir. 1994) (citing United States v. Gonzalez-Mercado, 808 F.2d 796, 800 n.8 (11th Cir. 1987)); United States v. Thomas, 488 F. App'x 440 (11th Cir. 2012) (citing Gonzalez-Mercado).  They are presumptively trustworthy and are considered conclusive absent compelling evidence showing otherwise; the subsequent presentation of conclusory and contradictory allegations does not suffice.  Blackledge, 431 U.S. at 73–74;  United States v. Butt, 731 F.2d 75, 80 (1st Cir. 1984) ("[T]he presumption of truthfulness of [defendant's] Rule 11 statements will not be overcome unless the allegations in the § 2255 motion . . . include credible, valid reasons why a departure from those earlier contradictory statements is now justified."); see also Gonzalez-Mercado, 808 F.2d at 800 n.8 (while not insurmountable, there is a strong presumption that statements made during a plea colloquy are true, citing Blackledge and other cases).  Defendant has shown no compelling reason for his sudden shift in position.

sentence pursuant to 28 U.S.C. § 2255 have merit.  Accordingly, Defendant's motion should be denied in its entirety.

### Certificate of Appealability

Section 2255 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  § 2255 Rule 11(b).

After review of the record, the court finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, it is also recommended that the court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Based on the foregoing, it is respectfully **RECOMMENDED**:

1.  The Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct Sentence (Doc. 83) should be **DENIED**.

2.  A certificate of appealability should be **DENIED**.

**IN CHAMBERS** at Gainesville, Florida, this 10th  day of June, 2014.


*s/Gary R. Jones*
GARY R. JONES
United States Magistrate Judge


## **NOTICE TO THE PARTIES**

**Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636;** **United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**